**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | |
|---|---|
| **THE ESTATE OF M.L., DECEASED, and** § | |
| **SHAKENDRA COOK, INDIVIDUALLY** § | |
| **and ON BEHALF OF THE HEIRS OF M.L.** § | |
|     **Plaintiffs** § | |
| § | **CIVIL ACTION: !:20-cv-00087-MAC** |
| **vs.** § | |
| § | |
| **SPRING INDEP. SCHOOL DISTRICT,** § | |
|     **Defendant; and** § | |
| | |
| **THE ESTATE OF T.J., DECEASED, and** § | |
| **SHEVONNE KENNEDY, INDIVIDUALLY** § | |
| **and ON BEHALF OF THE HEIRS OF T.J.** § | |
|     **Plaintiffs** § | |
| **vs.** § | |
| § | |
| **ALDINE INDEP. SCHOOL DISTRICT** § | |
|     **Defendant; and** § | |
| | |
| § | |
| **C.C. b/n/f ART and PATRICIA CHUPKA** § | |
|     **Plaintiffs** § | |
| § | |
| **vs.** § | |
| § | |
| **PFLUGERVILLE INDEPENDENT** § | |
| **SCHOOL DISTRICT** § | |
|     **Defendant.** § | |

<u>**PLAINTIFFS' AMENDED COMPLAINT AND JURY DEMAND**</u>

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW, Shakendra Cook, Individually and formerly as the natural parent of M.L., deceased, and also in her capacity as personal representatives of the Estate of M.L., (hereinafter collectively referred to as the "M.L. Plaintiffs") complaining of the Spring Independent School District (hereinafter referred to as the "Spring ISD"); and Shevonne Kennedy, Individually and formerly as the

Amended Complaint

natural parent of T.J., deceased, and also in her capacity as personal representatives of the Estate of T.J., (hereinafter collectively referred to as the "T.J. Plaintiffs") complaining of the Aldine Independent School District (hereinafter referred to as the "Spring ISD"); and Art and Patricia Chupka, a/n/f of C.C. (hereinafter collectively referred to as the "C.C. Plaintiffs") complaining of the Pflugerville Independent School District (hereinafter referred to as the "Pflugerville ISD") ad collectively known as "Plaintiffs" files *Amended Complaint and Jury Demand* as more fully specified below. Plaintiffs reserve the right to replead this *Complaint* if new claims and issues arise upon further development of the facts, as permitted by law.  In support thereof Plaintiffs would respectfully show this tribunal the following

## I.  NATURE AND PURPOSE OF THE ACTION

1.      It would seem to be common sense that when a child, especially one with significant medical issues,  is in need of emergency medical services, School District personnel would automatically call for Emergency Medical Services ("EMS").  The three Defendant School District's named in this case, Spring, Aldine and Pflugerville all have an unwritten policy, practice and custom which completely restricts and inhibits staff from calling for emergency medical services, even when the child is experiencing a medical emergency, or in three of the cases noted above, a life-threatening medical crisis.

2.      The named Plaintiffs noted above believe that this unwritten policy, practice and custom is not just unique to their own child's injuries and resultant death, nor an accident nor coincidence, but is rather purposeful and rises to the level of a conspiracy. It is for this reason that these four cases, with three ending in death, must be merged into one case before one Judge, as otherwise it would be difficult, if not impossible to show the custom and practice of School District's when faced with a medical emergency connection by a student.

## II.  PROCEDURAL RESUME

3.   This action originates from a previous civil lawsuit that was severed in accordance with a Motion to Sever that was filed by Beaumont Independent School District. This action was created for the remaining Plaintiffs, who were ordered to file an amended pleading that omits claims asserted against BISD and to show cause, as to why the remaining claims are not misjoined, why their civil conspiracy claim should not be dismissed.  Plaintiffs proceed accordingly.

### III.  <u>JURISDICTION</u>

4.   Jurisdiction is not conferred upon this Court pursuant to 28 U.S.C.A. §1331 and 1343 because the matters in controversy arise under the Fourteenth Amendments to the United States Constitution and the laws of the United States including but not limited to Section 504 of the  Rehabilitation Act of 1973, 29 U.S.C. §794 and the Americans With Disabilities Act, 42 U.S.C. §12131 et seq., and the federal regulations issued thereunder.  Moreover this Court has supplementary jurisdiction oover state and common law claims.

5.   As previously argued in the Motion filed in this matter [DE #2] on March 11, 2020, Plaintiffs believe that venue for the this matter should be transferred.

### IV.  <u>VENUE</u>

6.   Under 28 U.S.C. §1391, venue is proper before this Court because the events and omissions giving rise to the Plaintiffs' claims occurred in the Southern District of Texas, Houston.  While the injuries of the one other Plaintiff occurred in an other area of the state, for issues of judicial economy and so that justice may be done, they are best all litigated in this already existing cause as there are common issues of fact and law.

### V.  <u>PARTIES</u>

7.   M.L. while alive, was a citizen of the State of Texas, a student with a disability and was, at all pertinent times, a student at the Spring Independent School District.  Shakendra Cook  is a citizen

of the State of Texas and resident of Harris County, and sues as M.L.'s surviving mother and as a representative of M.L.'s estate. Her address is 500 Airtex Drive, Apt. 2902, Houston, Texas 77090.

8.      Defendant Spring Independent School District is a school district organized under the laws of the State of Texas. Spring ISD was at all pertinent times responsible for the care, management and control of all public-school business and transportation vehicles within its jurisdiction, the hiring, training and supervision of teachers at the School as to safety and supervision of students with disabilities within the district. Defendant Spring ISD may be  served through its General Counsel, the Honorable Jeremy Brinkley, at the he Office of Legal Services, 16717 Ella Boulevard, Houston, Texas 77090.

9.      T.J. while alive, was a citizen of the State of Texas, a student with a disability and was, at all pertinent times, a student at the Aldine Independent School District.  Shevonne Kennedy,  a citizen of the State of Texas and resident of Harris County, and sues as T.J.'s surviving mother and as a representative of his estate. Her address is 2206 Winter Baylane, Houston, Texas 77088.

10.     Defendant Aldine Independent School District is a school district organized under the laws of the State of Texas. Aldine ISD was at all pertinent times responsible for the care, management and control of all public-school business and transportation vehicles within its jurisdiction, the hiring, training and supervision of teachers at the School as to safety and supervision of students with disabilities within the district. Defendant Aldine ISD may be  served through its General Counsel, the Honorable Kaye DeWalt, at the Office of Legal Services, 2520 W.W. Thorne Boulevard, Houston, Texas 77073.

11.     C.C. is a citizen of the State of Texas, and at all pertinent times, still is a student at the Pflugerville Independent School District.  His father Art, and mother Patricia Chupka are too citizens of the

State of Texas and residents of Travis County.  They sue in their capacity as next friends.  Their address is 3608 Taylor Falls Drive, Pflugerville, Texas 78660.

12.  Defendant Pflugerville Independent School District is a school district organized under the laws of the State of Texas. Pflugerville ISD was at all pertinent times responsible for the care, management and control of all public-school business and transportation vehicles within its jurisdiction, the hiring, training and supervision of teachers at the School as to safety and supervision of students with and without disabilities within the district. Defendant Pflugerville ISD may be served through its Superintendent, the Honorable, at the Administrative Offices at 1401 West Pecan Street, Pflugerville, Texas 78660.

## VI.  STATEMENT OF FACTS

A.  MEDICAL CARE FOR STUDENTS IN TEXAS PUBLIC SCHOOLS

13.  The Texas Association of School Boards (TASB) develops policies and procedures for Texas school districts.  While each district is able to develop their own, or modify the ones suggested based upon local needs, they are essentially the same.

14.  The TASB has has developed policies and procedures to address "WELLNESS AND HEALTH SERVICES- MEDICAL TREATMENT, with two separate types, one called FFAC (LEGAL) and FFAC (LOCAL).  FFAC (LOCAL) requires a School District to develop "emergency procedures" when there is "Accidents Involving  Students."

15.  The Spring ISD has also adopted FFAC (LEGAL) and FFAC (LOCAL) but added FFAC (Regulation) and FFAC (Exhibit).  This "Exhibit" states that it deals with medication and emergency health care but is otherwise not addressed.

16.  The Aldine ISD has also adopted FFAC (LEGAL) and FFAC (LOCAL) but added FFAC (Regulation) and FFAC (Exhibit).

17.     The Pflugerville ISD has also adopted FFAC (LEGAL) and FFAC (LOCAL) but added FFAC (Regulation) and FFAC (Exhibit).

18.     School District Superintendents and other professional staff including and especially nurses, likewise meet for continuing education programs, and among other things, also participate in continuing education programs regarding school district policies and procedures, including and especially those related to emergency medical care.

19.     It is at these various professional meetings, where both formal and informal that discussions occur regarding the provision of, lack thereof, or refusal to provide emergency medical care for students.

B.      RELEVANT STANDARDS OF CARE FOR CHILDREN

        1.      The Individuals With Disabilities Education Act

20.     In 1972 Congress launched an investigation into the status of children with disabilities and found that millions of children were not receiving an appropriate education. After the investigation Congress stated that:

> "parents of handicapped children all too frequently are not able to advocate the rights of their children because they have been erroneously led to believe that their children will not be able to lead meaningful lives....It should not...be necessary for parents throughout the country to continue utilizing the courts to assure themselves a remedy...."

21.     This investigation resulted in Public Law 94-142 also known as *"The Education for All Handicapped Children Act of 1975.*" Initially, the law focused on ensuring that children with disabilities had access to an education and due process of law. Since that time, Congress has amended and renamed the special education law several times, now it is called the *Individuals with Disabilities Education Act* ("IDEA"). It was most recently amended in 2004. In its re-implementation, the purpose section of IDEA is noted:

> "...to ensure that all children with disabilities have available to them a *free appropriate public education* ("FAPE") that emphasized special education and *related services*

designed to meet their unique needs and prepare them for further education, employment and independent living and to ensure that the *rights* of children with disabilities ... are protected.." 20 U.S.C. §1400, 1401(9)[defining FAPE].

*Related Services*, 20 U.S.C. §1401(26), *see also* 34 C.F.R. §300.34(16), includes but is not limited to specialized transportation services for a child with a disability. Moreover, a student who is medically fragile must receive their special education services and accommodations in the classroom, in the gymnasium, and while traveling on a bus when going to and from the school campus. I.C.D. is one such student.

2.      Medical And Nursing Care For Students With Disabilities Under IDEA

22.     As a general rule a School District does have a duty to provide a student who is receiving services under IDEA, medical services at school. The only requirement for students is that a physician report could help determine eligibility for special education services and delegate to a school nurse, the provision of certain health care needs for a student. 20 U.S.C. §1401(26); 34 C.F.R.300.34( c)(5). For students receiving services under the IDEA, the provision of a medically directed nursing  plan is also called a *Related Service under* 34 C.F.R. §300.34( c)(13). Such services are put into the student's *Individualized Education Plan* ("IEP").

3.      Nursing Care For Students With Under IDEA

23.     The Texas Board Of Nursing ("BON") has developed a number of *Position Statements* for nurses in general and *Registered Nurses In The School Setting* in particular; see also 19 T.A.C. §153.1022(a)(1)(D). In fact the BON *Position Statement* 15.14 recognizes that the provision of nursing services in a school is a professional "specialty," meaning an ever higher standard of care and is expected. For all students where necessary an Individualized Nursing Plan is required. Importantly, and for a nurse in any setting, *see Position Statement* 15.15, they also have an independent  duty to a patient that cannot be superceded by, for instance, a school district policy;

*see also* 22 T.A.C. §213.27- .29.

4.      Section 504 Of The Rehabilitation Act Of 1973

24.    Section 504 Of The Rehabilitation Act Of 1973, 29 U.S.C. §794 is a statute addressing

discrimination based upon disability.  It does not have all the specifics noted in the IDEA statute

and related regulations but does have some regulations, *see* 34 C.F.R. §104.31- 104.37, that pertain

to the public school setting. Importantly, what is called a *Section 504 Accommodation Plan* must

also provide related aids and services to meet the individual educational needs of students with

disabilities as adequately as it meets the needs of nondisabled students. 34 C.F.R. §104.33 (b).

Plaintiffs M.L. and T.J. satisfy criteria as a student with a disability that either received, or should

have received, Section 504 Accommodations.

25.    While Section 504 regulations do not list specific types of related services as they do in IDEA,

Executive Agency Guidelines from the U.S. Department of Education, *Office of Civil Right*s

demonstrate that the legal principles regarding the identification of specific related services are

substantially similar under both laws. Administration of medication and other health-related

services were or should have been available to M.L. and T.J, as a related services under Section

504.

5.      Other Reasonable Accommodations For Students With A Disability

26.    For all the students who had disabilities in this cause, whether it be under IDEA or M.L. and T.J

under Section 504, they each should have received a number of "reasonable accommodations."

27.    For instance, one such reasonable accommodation for all students with a disability, is having

competent staff.

28.    Another reasonable accommodation for all students having a disability, is having specifically

trained staff, in assessing the needs of a student with a disability for nursing care at school.

29.    In a related vein, another reasonable accommodation for all students having a disability, is having a nursing plan or an Individualized Health Plan, so as to receive nursing care at school.

30.    Moreover, and in a related vein, another reasonable accommodation is assuring staff is trained in providing life-sustaining care in emergency situations in any all areas under a District's purview.

31.    In regard to off-campus transportation another reasonable accommodation is having staff specifically trained on how serve the needs of a medically fragile student on a school bus.  For instance, if a child requires special handling because of for instance, wheel-chair seating, or specialized harnessing to assure safety while on the bus, the staff must be trained to address the unique and individualized needs of that student.

32.    In regard to all students with a disability staff must be provided protocols on how to reach Emergency Medical Services in a timely manner, when warranted.

33.    Of course, the most important accommodation is to contact Emergency Medical Services when warranted.

C.    ABOUT M.L.

34.    M.L. was born on November 4, 2004.  She died on February 11, 2018 when she was thirteen (13) years old. M.L. attended the Barnwell Middle School at the Spring Independent School District. M.L. had substantial problems with Asthma and was considered a person with a disability for purposes of this litigation.  She was a sweet child and would listen to authority figures, even to her own detriment.

35.    In fact, M.L. was admitted to the Texas Children's Hospital on October 27th and 28th of 2017 for treatment of her Asthma. Unfortunately she had to return to the Intensive Care Unit for three (3) days in December of 2017 for treatment.  She stayed home when school re-opened on January 8, 2018 and upon return the next day, her mother Shakendra Cook provided a letter to the School

Nurse, the Attendance Counselor and an original to the Physical Education Teacher, confirming what was already known, that M.L. had been hospitalized in the ICU during the holiday season.

36.   On the morning of the 9th M.L. took a treatment before school.  Upon return to the campus she told the Physical Education ("P.E.") Teacher she could not participate in class because she was still weak and having problems with breathing.  Amazingly, that wasn't enough for the PE Teacher who told her that mother's note was not a doctor's note.  She then required M.L. to participate in class and run with her classmates.  Not surprisingly, she began to have major breathing problems and an asthmatic attack. This included shortness of breath, coughing, wheezing, tightening of her chest and fatigue.  She told the P.E. Teacher who permitted her to go to the Nurse's Office.

37.   M.L. felt so poorly she had a friend go with her.  Apparently the School Nurse was prepared for such a situation and gave her a quick relief inhaler and released her back to class.  But that didn't work, as M.L. continued to have worsening symptoms so she went back to the Nurse.   The Nurse provided another use of the inhaler and rather than send her back to class, permitted M.L. to lie down.  But the treatments were not working and M.L. continued to have significant symptoms so she asked the Nurse to use the inhaler for another time. There is a protocol with inhalers that only a certain number could be used within a certain time. As such, the Nurse did not provide this treatment knowing it was too close in time to the previous treatments. Moreover, she also recognized that she could provide no further treatments but rather than calling Emergency Medical Services as she should have done, the Nurse called the family to come to the school to pick their daughter up. As we now, there was an unwritten protocol not to call EMS.

38.   In any case, her father came to the school and brought M.L. home.  Within a few minutes it was very obvious that M.L.'s condition was much worse then the family had been led to believe by the School Nurse.  They called EMS and an ambulance finally came about fifteen (15) minutes later.

Later the family learned that by then her left lung had already collapsed and had suffered a heart attack.  She was taken to the hospital and provided treatment but there was no benefit so she was taken off life support about a month later.  M.L. died on February 11, 2018..

39.     Upon reason and belief, in addition to the acts and omissions noted above, Plaintiffs reasonably believe that the Spring School District had a policy, procedure, practice and custom in place that required staff to abandon personal judgment, common sense and the law to not contact Emergency Medical Services ("EMS") when it was obvious that a student, one like M.L. required immediate emergency medical services.

D.      ABOUT T.J.

40.     T.J. was born on August 10, 2006. He died on April 25, 2019 when he was twelve (12) years old. He always had very good grades and was known to be very respectable to his elders and teachers. T.J. had a significant heart murmur.  Medical information was provided from mother, and in put into his permanent  school record, noting this condition.  Importantly, and among other things, it required him to receive frequent breaks when in Physical Education ("P.E.") Class.  T.J. was directed by his mother to be sure to tell any of his teachers about his condition, and need for breaks.  For the purposes of this litigation he was a person with a disability.

41.     He attended the Garcia Middle School at the Aldine Independent School District and was in 6th Grade at the time of his death.  His educational and medical records transferred with him. At that time T.J. was about 5'3" and weighed almost two hundred twenty (220) pounds.  The coaches wanted him to get ready for football, even though football was only available to 7th Grade Students so he was placed in a P.E. Class with the 7th Grade football team members after Spring Braek.  As a matter of course, each and every student who was going to participate in football had to have a completed medical clearance completed.  Unfortunately and ultimately fatal, the District never had

T.J. have a physical exam completed.

42.   On April 25th, the regular staff had a meeting so the P.E. Football Program was left in the hands of two assistants, a Coach Bennett and a female assistant coach.  As he had been directed to do, T.J. informed the coaches he was not feeling well that day.  Her response was that he had to stop being lazy and he had to complete the warm-ups or he would get a zero in the class.  T.J. continued in class. When warm ups were completed normally the students got a 10 minute water and rest break.  Then they would go outside for further practice.  That day the male assistant coach took the break away.  He also kept the students inside and had them do excessive exercises in punishment for some of the students not performing in the earlier warm up session. T.J. actually begged for water and a break but it was refused.  Within minutes he collapsed.  Another student got the attention of the assistant coach.  Another went to the nurses office which was just next door. When the Head Coach finally arrived he did check vital signs and began CPR.  The nurse did not show up for approximately 15-20 minutes. Assistant Coach Bennett never provided CPR. Nor did he or the female assistant or the nurse, call EMS based upon T.J.'s obvious medical needs. At some point EMS was contacted and was brought to the hospital.   T.J. had expired.

43.   Upon reason and belief, in addition to the acts and omissions noted above, Plaintiffs reasonably believe that the Aldine School District had a policy, procedure, practice and custom in place that required staff to abandon personal judgment, common sense and the law, to not contact Emergency Medical Services ("EMS") when it was obvious that a student, one like T.J., required immediate emergency medical services.

E.    ABOUT C.C.

44.   C.C. was born on July 20, 2005.  At all time relevant to this case was a 9th grade student at the Weiss High School with the Pflugerville Independent School District.

45.     On August 26, 2019 C.C. was in second period P.E. Class. He fell and broke his arm, in what turned out to be in two places. When he first fell he also complained to his coach and then the Principal about the horrible pain he had in his arms, hip and leg.  He told them he needed to go to a hospital.  Nurse White arrived.  He told them all again he was in excruciating pain and needed to go to the hospital.  He was told "its going to be OK."  C.C. was picked up and put in a wheelchair. He later required surgery to deal with a dislocated and broken hip. Obviously, he never should have been moved or picked up and put in a wheelchair.

46.     At some point mother received a call from the Nurse and stated they were having a hard time calming C.C. down and asked for her to come to the school to get him.  It took about 20 minutes to get there. When mother got to the school she could hear her son screaming through the windows and door.  Apparently he had been screaming for now close to an hour.  Mother left the school with C.C. in a wheelchair.  Mother called for an ambulance but he didn't want to wait so they drove to a local care center.  The ER physician had to pick C.C. up out of the car for X-Rays and a CT scan.  He was later put into an ambulance and taken to a hospital for treatment.  He was unable to go to school for a significant period of time.  He continues to be in physical therapy treatment for the injuries sustained.

47.     Upon reason and belief, in addition to the acts and omissions noted above, Plaintiffs reasonably believe that the Pflugerville ISD had a policy, procedure, practice and custom in place that required staff to abandon personal judgment, common sense and the law to not contact Emergency Medical Services ("EMS") when it was obvious that a student, one like C.C., required immediate emergency medical services.

F.     Other Instances

48.     Sadly these are not the only cases in which Texas school district and their staff member have failed

to render aid to a student who is experiencing an urgent medical crisis.

49.   In 2011 a three year old boy "I.C.D." died while riding a bus operated by Beaumont Independent School District. I.C.D. was born with cranial stenosis, also known as soft skull spot;  had poor muscle control, general muscle weakness, a severe orthopedic impairment and a propensity for falling down. He died sitting in a school bus less than a mile from a hospital due to the fact that he had been strapped in too tightly by an aide who was not familiar with his particular conditions and needs.  That case was originally filed in the Eastern District of Texas, Beaumont Division at Case 1:18-cv-00137-MAC.

50.   On or about January 17, 2017 Destiny Cano, who was at the time a student at the Harlandale Independent School District, was injured while performing an excessively dangerous performance for a school pep rally. She was severely and permanently injured. The stunt the dance team she was performing with had not managed to successfully perform the stunt ever during practices; however the team's coach still ordered them to attempt the routine without mats. Ms. Cano suffered a severe concussion. At no time did the coach or any other staff member attempt provide any medical care other than giving her an ice pack. EMS was not contacted nor was not contacted. She was not evaluated for a concussion or any other injuries. Her mother was called and upon realizing the severity of her injuries, she transported her to a medical facility which immediately referred her to be transported to an emergency room instead. Destiny was diagnosed with spinal cervical strain, a concussion, neck pain, neck sprain and post-concussion syndrome. Later she had a CT scan which showed soft tissue swelling.  This case is filed in the Western District of Texas, San Antonio Division at Case 5:19-cv-01296-FB.

### VII.  CONDITIONS PRECEDENT AND ADMINISTRATIVE EXHAUSTION

51.   Plaintiffs incorporate by reference all allegations in the above related paragraphs with the same

force and effect as if herein set forth. Additionally, each paragraph below incorporates by reference the section and paragraph noted above it.

52. Plaintiffs contend there is no need for administrative exhaustion in this cause as to M.L. and T.J., which may otherwise be required pursuant to IDEA, 20 U.S.C. §1415(1) and 19 T.A.C. §89.1185(p) as noted in the recent Supreme Court case <u>Fry v. Napoleon Community School</u>, 137 S. Ct. 743 (2017) as the gravamen of the Estate's claim, is discrimination based upon disability.

53. Further, and in addition and in the alternative, exhaustion is not warranted as M.L. and T.J. are deceased and there is no relief pursuant to IDEA that a Texas Education Agency Hearing Officer could provide, and as such, exhaustion would be futile. *See* <u>Moore v. Chilton Cnty Bd. of Educ</u>., 936 F. Supp. 2d 1300, 1308 (M.D. Ala. 2013); <u>Morton v. Bossier Parish Sch. Bd</u>., 2013 U.S. Dist. LEXIS 26430 (W.D. La., 2013).

## VIII. <u>STATE ACTION</u>

54. Each Plaintiff incorporates by reference all the above-related paragraphs with the same force and effect as if herein set forth. In addition, each sentence and paragraph below, likewise incorporates by reference as if fully set forth herein, the one above it.

55. Each School District Defendant was at all times and in all matters acting under color of state and federal law when they permitted M.L., T.J. and C.C., to be subjected to the acts, omissions, wrongs and injuries hereinafter set forth.

## IX. <u>UNCONSTITUTIONAL POLICIES, PROCEDURES, AND PRACTICES</u>

56. While alive, M.L., T.J., and C.C. each had and have a constitutionally protected right to life, liberty and the pursuit of happiness, pursuant to the *Due Process Clause* of the 14th Amendment to the United States Constitution.

57. Each School District Defendant, acting under color of law and acting pursuant to customs and

policies of the district, deprived M.L., T.J. and C.C. of rights and privileges secured to them by the Fourteenth Amendment to the United States Constitution and by other laws of the United States as noted in this section.

58.  Each School District Defendant failed to develop policies, procedures and practices intended to keep a student with a disability, like M.L. and T.J., safe from harm when at school and when transported to and from school, violating their rights under the Constitution thereby.  This failure was a moving force in the injury of C.C. and the injuries and death of M.L. and T.J.

59.  Worse yet, each of the Defendants School District's had an unwritten policy, procedure, practice and custom that is constitutionally infirm.  Specifically, when a student would be experiencing a medical crisis at school or on a school bus, staff were not permitted to contact emergency medical services, even if their independent awareness of any given situation, would otherwise mandated they do so. This unwritten but well-settled policy and practice, wasted valuable seconds where life was held in the balance and for those precious seconds where "each second counts." The failure to seek emergency medical services in a timely manner was a moving force in the injury of C.C. and the injuries and death of M.L. and T.J.

60.  In addition and in the alternative, each School District Defendant failed to *hire* staff skilled in health and safety practices for children in general, and children with a disabilities in particular, violating the Fourteenth Amendment of the Constitution of the United States for which all Plaintiffs seek recovery pursuant to 42 U.S.C. §1983, thereby.

61.  Further, and likewise in addition and in the alternative to the failures noted above, each School District Defendant, failed to sufficiently *train* staff in health and safety practices for children in general, and for a child with a disability in particular, violating the Fourteenth Amendment of the Constitution of the United States for which all Plaintiffs seek recovery pursuant to 42 U.S.C.

§1983, thereby.  This failure was a moving force in the injury of C.C. and the injuries and death of M.L. and T.J.

62.     Moreover and similarly in addition and in the alternative to the failures noted above, each School District Defendant, failed to sufficiently *supervise* staff in health and safety practices for children in general, and for a child with a disability in particular, violating the Fourteenth Amendment of the Constitution of the United States for which all Plaintiffs seek recovery pursuant to 42 U.S.C. §1983, thereby.  This failure was a moving force in the injury of C.C. and the injuries and death of M.L. and T.J.

63.     In summary, Plaintiffs contend that the failure of the various School District Defendants to assure that a student who requires emergency medical care receives such care in a timely manner, violates the Fourteenth Amendment of the Constitution of the United States for which Plaintiffs seek recovery pursuant to 42 U.S.C. § 1983.  Each School District surely knew of the dangers of not providing or securing emergency medical services, or should of known of the dangers of not providing a student in need, of emergency medical services in a timely manner, and as such disregarded the health and safety of students M.L. T.J. and C.C.  Such acts and omissions by each of the School District Defendants rise to the level of deliberate indifference to each child's welfare.

## X.  CIVIL CONSPIRACY

64.     The acts and omissions of each School District Defendant, in refusing to call *Emergency Medical Services* on behalf of a child who was obviously in need of such services, raises a very, very strong inference that such acts and omissions were pre-determined by School District Officials.  Such a meeting of the minds, was for an unlawful purpose or in addition and in the alternative, a lawful purpose but used unlawful means.  Further each committed an overt act in furtherance of such objectives and each Plaintiff suffered an injury as a proximate result of such wrongful act.

65.     The reason for the acts and omissions of each School District Defendant, and conspiracy between the Defendants is unknown but one can easily surmise the reasons each School District would not call *Emergency Medical Services* when the student's condition absolutely required such services. First, each District would not want to be responsible for the payment of an ambulance and emergency medical services coming to campus. Second, the District would not want to alarm other students and their families, if and when it became known that an ambulance was on campus. Third, the School District Defendants have a duty to report such incident to the Texas Education Agency ("TEA"), and such reports are seen as a detriment and reduce the scores that school district receives from the TEA.  The fourth reason would be to avoid the duty to report abuse and neglect to Child Protective Services.

66.     Plaintiff alleges that the School District Defendants, acting in concert with each other, and with intent to commit civil conspiracy, and by and through its School Board, Superintendent. directors, officers, employees and agents, and contract services, wilfully conspired to inhibit each student from receiving necessary Emergency Medical Services violating 42 U.S.C. 1985 [Conspiracy To Interfere With Civil Rights].

## XI.  CLAIMS PURSUANT TO SECTION 504 OF THE REHABILITATION ACT

67.     The facts as previously described demonstrate violations of Section 504 of the Rehabilitation Act, 29 U.S.C. §794 ("Rehabilitation Act").

68.     M.L. and T.J. are each qualified individuals with a disability in the United States, as defined in 29 U.S.C. §705(20), having either or both cognitive, mental and physical disabilities affecting a number of major life activities.

69.     Each School District Defendant receives federal financial assistance, as defined by 29 U.S.C. §794 and, as such, and may not discriminate against a person because of their disability. Each related

School District Defendant did in fact discriminate against M.L. and T.J by failing to have relevant policies, procedures, practices and customs in place to properly address medical emergencies.

70. Each School District Defendant *grossly mismanaged* M.L. and T.J educational plan in violation of the Rehabilitation Act thereby. In addition, and in the alternative to the above, staff with each Defendant School District *grossly deviated from professional standards of care* as to M.L. and T.J a separate violation of the Rehabilitation Act thereby.

71. Likewise, and also in addition and in the alternative, M.L. and T.J each have a private cause of action against each relevant School District Defendant for their failure to follow federal regulations, promulgated pursuant to Section 504.

## XII. CLAIMS UNDER THE AMERICANS WITH DISABILITIES ACT

**72.** The facts as previously described demonstrate violations of the Americans with Disabilities Act, 42 U.S.C. §12131, et seq ("ADA").

73. M.L. and T.J are each a "qualified individual with a disability" as defined in 42 U.S.C. §12131(2); *see also* Section 504.

74. Each School District Defendant is deemed a "public entity" as defined in 42 U.S.C. §12131(1) and must thus satisfy the mandates of the ADA.

75. In addition, School District Defendant and its schools are facilities whose operation constitutes a program and services for ADA purposes.

76. Each School District Defendant failed and refused to reasonably accommodate the disabilities of M.L. and T.J. and modify their services and accommodate their disabilities in violation of Title II of the ADA.

77. Moreover once C.C. was injured, he became a person with a disability deserving protection and reasonable accommodations under the act, and he did not receive such protections or

accommodations.

## XI.  **WRONGFUL DEATH CLAIMS**

78.    Each decedent was a loving and dutiful child and provided reasonable love, affection and services to his family.

79.    As a result of the wrongful death of M.L. her mother did suffer damages, including termination of the parent-child and familial relationship and severe mental anguish, and will, in reasonable probability, continue to suffer damages in the future as a direct result of the wrongful death of her child, in an amount within the jurisdictional limits of the court.  Additionally, she seeks damages for loss of companionship and society, both past and future.

80.    As a result of the wrongful death of T.J. his mother and father did suffer damages, including termination of the parent-child and familial relationship and severe mental anguish, and will, in reasonable probability, continue to suffer damages in the future as a direct result of the wrongful death of her child, in an amount within the jurisdictional limits of the court.  Additionally, she seeks damages for loss of companionship and society, both past and future.

## XII.  **SURVIVORSHIP CLAIMS**

81.    This claim for damages resulting from the death of M.L. and T.J. is brought by the surviving family member noted above, each a personal representatives of their child's estate. These claims are based upon the facts and legal theories more fully set out herein.

82.    Any person required to be a named Plaintiff in this lawsuit to collect damages under Section 71.021., Tex. Civ. Prac. & Rem. Code, is a already named Plaintiff, or will be added accordingly. Plaintiffs bring this survival action pursuant to Tex Civ. Prac. & Rem. Code, Section 71.021, because of personal injuries suffered by each of the decedents, which resulted in the death of each, based upon the facts and legal theories more fully set out above.

83.     Plaintiffs seek damages for the conscious pain and suffering and mental anguish that each decedent suffered prior to death and for the reasonable and necessary medical, funeral and burial expenses which were reasonably incurred because of such wrongful death. Plaintiffs seek damages within the jurisdictional limits of the court.

### XIII.  RATIFICATION AND RESPONDEAT SUPERIOR

84.     Each Defendant Independent School District ratified the acts, omissions, customs and practices of school district personnel and staff.

85.     As a result, each Independent School District Defendant is responsible for the acts and omissions of staff persons who were otherwise responsible for the safety of each student.

### XIV.  PROXIMATE CAUSE

86.     Each and every, all and singular, of the foregoing acts and omissions, on the part of a School District Defendant, taken separately and/or collectively, jointly and severally, constitute a direct and proximate cause of the injuries and damages set forth herein.

### XV.  DAMAGES

87.     As a direct and proximate result of each of the School District Defendants conduct noted herein, the families of M.L., T.J. and C.C. have suffered injuries and damages, including but not limited to the following:

     a.     Reasonable medical care and expenses in the past for each student. These expenses were incurred by the subject of this lawsuit, for the necessary care and treatment of the injuries resulting from the accident complained of herein and such charges are reasonable and were usual and customary charges for such services in Texas;

     b.     Physical pain and suffering in the past for each student;

     c.     Mental anguish in the past for each student;

    d.      Mental anguish in the future for C.C.;

    e.      Physical impairment in the future for C.C.;

    f.      Physical impairment leading to death in the past for M.L. and T.J. ;

    g.      Loss of Consortium in the past, including damages to the family relationship, loss of care, comfort, solace, companionship, protection, services, and/or physical relations for the families of M.L. and T.J.;

    h.      Loss of Consortium in the future including damages to the family relationship, loss of care, comfort, solace, companionship, protection, services, and/or physical relations M.L. and T.J.;

    i.      Disfigurement in the past for each student;

    j.      Disfigurement in the future for C.C. and

    k.      Loss of educational opportunities.

88.    By reason of the above subject of this lawsuit, Plaintiffs have suffered losses and damages in a sum within the jurisdictional limits of the Court and for which this lawsuit is brought.

## XVI.  **PUNITIVE DAMAGES**

89.    The acts and omissions and conspiracy between the the School District Defendants, amount to deliberate indifference to each student.  These acts and omissions of each Defendant School District, satisfy criteria for punitive damages, as contemplated by Section 1983.

## XVII.  **COSTS OF REPRESENTATION AND ATTORNEYS FEES**

90.    It was necessary for Plaintiffs to hire the undersigned attorneys to file this lawsuit. Upon judgment, Plaintiffs are entitled to an award of attorney fees, taxable costs and expert fees under 42 U.S.C. §1983, §1985 and §1988(b), the Rehabilitation Act and the the ADA pursuant to 42 U.S.C. §2000d *et seq*.

## XVIII.  DEMAND FOR JURY TRIAL

91.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a jury trial for all issues in

this matter.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment against each School District Defendant, jointly and

severally, in the manner and particulars noted above, and in an amount sufficient to fully compensate them

for the elements of damages enumerated above, judgment for damages, recovery of attorney's fees and

costs for the preparation and trial of this cause of action, and for its appeal if required, pursuant to Section

504, the ADA and 42 U.S.C. §1983, §1985 and §1988; together with pre- and post-judgment interest, and

court costs expended herein, and for such other relief as this Court in equity, deems just and proper.

Respectfully submitted,

Cirkiel & Associates, P.C.

/s/ Mr. Martin J. Cirkiel, Esq.
Mr. Martin J. Cirkiel
SBN: 00783829
Federal Bar No. 21488
marty@cirkielaw.com
Cirkiel & Associates, P.C.
1901 E. Palm Valley Blvd.
Round Rock, Texas 78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]; and

Mr. Cody A. Dishon, Esq.
SBN: 24082113
cdishon@thefergusonlawfirm.com
Mr. Paul Ferguson, Esq.
SBN: 06919200
cferguson@thefergusonlawfirm.com
The Ferguson Law Firm
Edson Plaza, Suite 1440
Beaumont, Texas 77701
(409) 832-9700 [Telephone]

Amended Complaint                                                                                      23

(409) 832-9708 [Facsimile]
**ATTORNEYS FOR THE DELAMETER PLAINTIFFS; and**

Mr. Anthony O'Hanlon, ESQ.
Anthony O'Hanlon, P.C.
SBN 15235520
111 South Travis Street
Sherman, Texas 75090
(903) 892-9133 [Telephone]
(903) 957-4302 [Facsimile]
aohanlon@somlaw.net [Email]; and

Mr. Martin J. Cirkiel
SBN: 00783829
Federal Bar No. 21488
marty@cirkielaw.com
**ATTORNEYS FOR THE M.L, T.J and CC. PLAINTIFFS**

## CERTIFICATE OF SERVICE

This is to certify that on this the 20TH of March, 2020, I electronically filed the foregoing document with the Clerk of the Court for the U.S. District Court, Eastern District of Texas, using the electronic filing system of the Court. The electronic case filing system will send a "Notice of Electronic Filing" to any attorney of record who has consented to accept this Notice as service of this document by electronic means.

/s/ Martin Cirkiel
Martin Cirkiel, Attorney

Amended Complaint                                                                 24